UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TARGET LOCATION 4 AND THE TARGET TELEPHONE | Case No. 3:24-mj-848 RMS<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Andrew Pfeiffer, a Task Force Officer with the Drug Enforcement Administration being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND

1. I am a member of the Hamden Police Department in the capacity of a sworn police officer and have been employed as a certified police officer in the State of Connecticut since 2012. I am assigned to the Hamden Police Department Street Interdiction Team and am currently assigned as a Task Force Officer (TFO) for the Drug Enforcement Administration (DEA), New Haven District Office (NHDO)-Tactical Diversion Squad (TDS) and have been so assigned since 2019. My duties include investigating violations of the Connecticut General Statutes and the federal Controlled Substances Act, including but not limited to the diversion of controlled substances from legitimate medical channels.

2. As a law enforcement officer, I have conducted numerous investigations of violations of the law, which have led to arrests and convictions. I have coordinated controlled purchases of illegal drugs using confidential sources and cooperating witnesses. I have planned and participated in the execution of state and federal search warrants pertaining to individuals involved in the distribution of controlled substances, conducted electronic surveillance and physical surveillance of individuals involved in the distribution of controlled substances, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local,

1

state, and federal law enforcement officers, regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute illegal drugs.

3. I am a case agent investigating KELLDON HINTON and others for manufacturing and distributing controlled substances, including counterfeit pills, in the area of New Haven and beyond. Specifically, on September 5, 2024, KELLDON HINTON, HESHIMA HARRIS, EMANUEL PAYTON, SHAWN STEPHENS, and ARNALDO ECHEVARRIA were arrested, based upon a criminal complaint issued by this Court on September 4, 2024. HINTON was charged with Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846, and HARRIS, PAYTON, STEPHENS, and ECHEVARRIA were charged with Conspiracy Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846).

4. On September 18, 2024, a grand jury sitting in Bridgeport, Connecticut, returned a three-count Indictment charging the same individuals with drug trafficking offenses. Specifically, HINTON was charged with Conspiracy Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846, and with Possession with Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii). HARRIS, PAYTON, and STEPHENS, along with two new defendants, MARVIN

OGMAN and CHERYL TYSON, were similarly charged with Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846. ECHEVARRIA was charged as part of the conspiracy with HARRIS, PAYTON, STEPHENS, OGMAN, and TYSON and also with Possession with Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) (collectively, the "Charged Offenses").

## PURPOSE OF THE AFFIDAVIT

5. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Civil Procedure to search 98 Blohm Street, #2, West Haven, CT ("TARGET LOCATION 4"), further described in Attachment A-1, for evidence of the Charged Offenses and for contraband, fruits of crime, and property used in committing the Charged Offenses, as set forth more particularly in Attachment B-1, including but not limited to quantities of controlled substances, drug paraphernalia, drug packaging materials, cash deriving from the sale of drugs, bank records, business receipts, and invoices and/or documents and records relating to the Charged Offenses, including records stored in electronic form.

6. I also submit this affidavit in support of an application under Rule 41 of the Federal Rules of Civil Procedure for a search warrant authorizing the examination of a black iPhone seized from OGMAN's person during his arrest at 98 Blohm Street #2, West Haven, CT, on September 19, 2024 (the "TARGET TELEPHONE"), further described in Attachment A-2, and the extraction from that property of electronically stored information described in Attachment B-2.

## PROBABLE CAUSE

7. On September 5, 20244, DEA Task Force Officer Andrew Pfeiffer signed an affidavit in support of search warrants for 34 Tyler Street Extension, East Haven, CT ("Target Location 1")

3

and 55 Dewitt Street, New Haven, CT ("Target Location 2"); and one 2023 Gray Chevy Malibu bearing NY marker plate LJX9536 ("Target Vehicle 1") being used by HINTON in furtherance of the Charged Offenses, and in support of arrest warrants for HINTON, HARRIS, PAYTON, STEPHENS and ECHEVARRIA, as discussed above. A copy of that affidavit (hereinafter, the "Original Affidavit") has been attached as Attachment C and incorporated herein.

8. On September 17, 2024, DEA Task Force Officer Andrew Pfeiffer signed an affidavit in support of search warrants for several cell phones located in the possession of HINTON at the time of his arrest, including one gray "Samsung" smartphone (DEA Exhibit N-39) with cell phone number (475) 355-0907 (the "HINTON TELEPHONE"). A copy of that affidavit (hereinafter, the "Device Affidavit") has been attached as Attachment D and incorporated herein. On that same date, the Honorable Robert M. Spector authorized the search of those cell phones, which as to Exhibit N-39 commenced shortly thereafter. *See* In re Search Warrant, No. 3:24-MJ-837 (RMS).

9. As set forth above, on September 18, 2024, a grand jury sitting in Bridgeport returned an Indictment charging HINTON and others with drug trafficking offenses. In addition to HINTON, HARRIS, PAYTON, STEPHENS, and ECHEVARRIA, who had been previously charged by criminal complaint, the indictment charged two new individuals, including MARVIN OGMAN as a coconspirator in the criminal conduct.

### *Marvin OGMAN as a Drug Redistributor for the HINTON DTO*

10. During the investigation of the HINTON Drug Trafficking Organization ("DTO"), investigators identified an individual, subsequently identified as MARVIN OGMAN (DOB: xx/xx/1977, known to me) as a likely redistributor of HINTON's counterfeit pills in the New Haven area. Specifically, investigators have surveilled OGMAN travel from his residence, TARGET

4

LOCATION 4, on numerous occasions to meet with individuals and conduct what I believe to be, based on my training and experience, hand-to-hand transactions for controlled substances.

11. For example, on May 7, 2024, investigators conducted surveillance observed HINTON leave his garage laboratory with several items, including a reusable Target bag that HINTON had been observed using to deliver packages containing counterfeit pills to the U.S. Post Office for distribution to his dark web customers. His traveled with those items to his residence. Thereafter, OGMAN was observed arriving at HINTON's residence, entering and then exiting HINTON's residence within minutes. I know based on training and experience that brief meetings between individuals is an indicator of street level narcotics activity. Based on my knowledge of this case and of the individuals involved, I believe HINTON and OGMAN met for the purpose of conducting a narcotics transaction.

12. OGMAN then traveled to TARGET LOCATION 4 and entered the residence. Shortly thereafter, he was observed exiting TARGET LOCATION 4, entering his vehicle, and traveling to the McDonald's at 280 Kimberly Avenue in New Haven. OGMAN parked in the back of the parking lot, where he was observed meeting briefly with an individual, referred to herein as T.K., known to investigators to be a user of controlled substances. After the meeting with T.K., which lasted no more than one or two minutes, OGMAN departed the area.

13. On May 8, 2024, investigators again observed OGMAN meet with T.K. in a suspected hand-to-hand drug transaction.

14. During the last few months of the investigation, starting in the Summer of 2024, OGMAN appears to have increased his standing within the HINTON DTO. Surveillance has observed OGMAN entering HINTON's garage laboratory ("Target Location 1"), which as mentioned in the Original Affidavit, is a sensitive location with a purpose known only to a privileged

5

few and where HINTON and others were able to engage in the manufacturing of counterfeit pills, along with the distribution of counterfeit pills and other controlled substances on the dark web, and packaging of those pills for shipment to dark web customers across the United States. OGMAN has also been observed entering HINTON's garage laboratory by himself. On those days, OGMAN appears to be using a key to enter. This alone is enough to suggest that OGMAN is trusted by HINTON and remains high in the DTO hierarchy.

### *OGMAN's Use of TARGET LOCATION 4 and the TARGET TELEPHONE*

15. As set forth above, during surveillance, OGMAN had been observed on occasion entering TARGET LOCATION 4 after meeting with HINTON that investigators believe was for the purpose of obtaining quantities of narcotics to sell, and also departing TARGET LOCATION 4 for the purpose of meeting with suspected drug customers.

16. In addition, during the search of the HINTON TELEPHONE, which began on September 19, 2024 and remains ongoing, investigators located a series of messages with OGMAN using the phone number assigned to the TARGET TELEPHONE through Signal, which is an encrypted communications application. Some of those messages include the following:

17. On March 10, 2024, OGMAN sends HINTON a message, "I just set up Abacus Market account.[1] If you can, ask your ppls if the vendor fee is $1000. Just want to confirm." OGMAN then sends HINTON a picture of his new dark web vendor account.

18. On March 15, 2024, OGMAN sends HINTON a picture of a black Galaxy Tab S8 electronic device in a box. HINTON and OGMAN then engage in a voice call, and HINTON then sends OGMAN a series picture of what appears to be a drug scale, and other drug paraphernalia taken from his garage laboratory.

---

[1] I know Abacus to be a dark net marketplace which HINTON also used during the charged drug conspiracy.

19. On March 22, 2024, OGMAN messages HINTON, "I may Zelle or bitcoin yiu" and HINTON responds, "Ok. Don't forget send me your count so I know the balance and we can take it from there. We're offering 5 pills offers online now so I will be extremely busy soon." Subsequent texts on this date reflect HINTON providing OGMAN with a bitcoin wallet address to send funds to. OGMAN responds, "Got it. Handling now."

20. On March 28, 2024, HINTON messages OGMAN, "Fire [fire emoji] Adderall 30 mg back. Better than before." OGMAN responds, "Yes. We need them. I gotta call my ppls and let them know. Some of them I'll just give them too because they were pissed about the last batch, lol."

21. In addition, investigators located on HINTON's phone a video message sent by OGMAN of what appears to be OGMAN's arm in the driver's seat of a vehicle. OGMAN pulls up to an outdoor U.S.P.S. collection bin at night and then proceeds to put numerous, small, flat-rate mailers into the collection bin.

22. On August 11, 2024, OGMAN messages HINTON, "Ill hit you for the Addie's tomorrow" to which HINTON responds with a handshake emoji and salute emoji. Thereafter, OGMAN confirms and states, "Imma head to the bank to grab that $700."

23. At approximately 6:00 a.m. on September 19, 2024, DEA Special Response Team ("SRT") New England Field Division arrested OGMAN at his residence, TARGET LOCATION 4, pursuant to a federal arrest warrant that had been issued the day before upon the return of the Indictment charging him with the offenses set forth above. After repeatedly knocking and announcing law enforcement presence with a warrant, officers made a forced entry into the front door of TARGET LOCATION 4 and apprehended OGMAN on the stairway leading up to the landing area of the kitchen. At the time of his arrest, OGMAN was found in possession of the TARGET TELEPHONE, which had been tucked into one of his pant pockets. DEA investigators

7

called phone number (203) 908-6411, which is the phone number subscribed to OGMAN in both his name and his nickname, "Love," and which investigators located on the phone for T.K., a suspected counterfeit pill customer of OGMAN.[2]

24. Upon OGMAN's arrest on the stairwell, officers proceeded to the kitchen landing at the top of the stairs to conduct a quick protective sweep for others who might be present within the apartment. Visible from the kitchen at the top of the landing, officers observed several items in plain view, which they recognized to be items used in connection with HINTON's counterfeit pill distribution network. From the kitchen landing, officers could see directly into the right-side open living room area which contained a small desk/table with what appeared to be a laptop computer on it. In addition, on the kitchen counter, investigators observed several electronic, cell-phone type devices that appeared to be plugged in and charging, and to the right of the landing, a room containing small, medium, and large U.S. Postal Service ("USPS") flat-rate mailing boxes that were stacked in piles, consistent with the types of USPS mailers being used by HINTON and others to mail packages of counterfeit pills to customers on the dark web. *See* Original Affidavit ¶¶ 28-29.

25. After the residence had been cleared and no further individuals were located, officers exited with OGMAN, at which point he requested to go back inside the residence, explaining that he wanted to leave a set of keys for his children. Based on this request, officers escorted OGMAN back into the kitchen area of the residence so he could leave the keys, at which points the items describe again were in plain view. Thereafter, OGMAN was escorted out of the residence, and then made another request for water, indicating to the officer that OGMAN had water in his refrigerator

---

[2] On September 7, 2024, Middletown Police Department responded to a call for service for a suspected overdose. The victim, T.K., was unresponsive and ultimately passed away the following day. Text messages recovered from T.K.'s cell phone, and the record of a phone call between T.K. and the TARGET TELEPHONE are indicative of OGMAN having sold HINTON's counterfeit pills to T.K. earlier in the day. Investigators also located numerous pills consistent with those being trafficked by the HINTON DTO in T.K.'s bedroom.

8

at the top of the landing. An officer proceeded into the residence again, at OGMAN's direction, to get water from the refrigerator at the top of the landing, at which point the items describe above were again in plain view of the officer.

26. Based on my training and experience and knowledge of this investigation, I believe that the discussions of dark web vendor pages and cryptocurrency between HINTON and OGMAN are reliable indications that both HINTON and OGMAN are using the dark web to sell counterfeit pills to customers and that OGMAN would utilize various equipment, such as cell phones and laptop computers to access the dark web vendor pages, as discussed in the Original Affidavit at paragraphs 45-49, 57, . In addition, the presence of the USPS mailers at TARGET LOCATION 4 readily show that OGMAN was using TARGET LOCATION 4 to prepare dark web packages for distribution and that additional activities of that distribution will be present in TARGET LOCATION 4.

## CONCLUSION

27.    Based on this information set forth in this affidavit as well as the Original Affidavit, I respectfully submit that there is probable cause to believe that TARGET LOCATION 4 and the TARGET TELEPHONE contain evidence of the Charged Offenses.

Respectfully submitted,

_____
Andrew Pfeiffer
Task Force Office
Drug Enforcement Administration

The truth of the foregoing affidavit has been attested to me on this 19th day of September, 2024.

_____
HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to be Searched (Target Premises 4)

98 Blohm Street #2 in West Haven, Connecticut is described as a multi-family home with tan exterior.   The ground level is a two-car garage. The first level above the garage has two entryway doors on the front of the building. The door on the right, which has a #2 above it, is the access point for unit #2.



**Front of 98 Blohm Street #2**

## ATTACHMENT A-2

**Property to be Searched (Target Telephone)**

The property to be search is a black iPhone seized from OGMAN's person during his arrest at 98 Blohm Street #2, West Haven, CT, on September 19, 2024.

## ATTACHMENT B-1

### Particular Things to be Seized (Target Premises)

The following items evidencing violations of Conspiracy Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846) (collectively, the "Charged Offenses"):

1. Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

2. Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, pill punches/dies, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

3. Any books, records, receipts, notes, ledgers, journals, travel documents, and other papers relating to the purchase and distribution of controlled substances;

4. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the use of monies generated by the sale of controlled substances.

5. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

6. Business receipts, invoices, records of accounts payable and receivable, and general ledgers;

7. Identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers;

8. Records relating to ownership, occupancy, or use of the Target Premises (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers);

9. Records relating to the operation or ownership of any computer hardware, software, storage media, or data (such as user names, passwords, telephone records, notes, books, diaries, and reference materials);

10. Records pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media;

13

11. All computer equipment and peripherals that may be interdependent, the software to operate the computer system, related instruction manuals that contain directions concerning the operation of the computer system, the software programs, and all electronically stored or computerized computer data; any physical keys, encryption devices, dongles, passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data;

12. Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices including paging devices and cellular telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices such as modems, routers, cables, and connections; storage media; and security devices;

13. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

14. Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing, equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

15. All passwords, passphrases, encryption keys, encryption dongles, and/or any information, including tools, records, and techniques used to activate and/or navigate and access in plain-text data stored in encrypted data systems, encrypted filesystems, encrypted files, and encrypted records or documents;

16. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during the time the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software;

17. Records of any communications relating to drug trafficking; and

18. Firearms and ammunition.

14

## ATTACHMENT B-2

### Particular Things to be Seized (Target Telephone)

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that constitute evidence of potential violations of Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (the "Charged Offenses") for the time period of July 13, 2023 through September 19, 2024, including but not limited to the following:

a. the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the TARGET TELEPHONE;
b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the TARGET TELEPHONE;
c. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;
d. any and all records, however created or stored, which tend to demonstrate ownership and use of the TARGET TELEPHONE, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the TARGET TELEPHONE;
e. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the TARGET TELEPHONE, such as passwords, sign-on codes, and program design;
f. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
g. saved searches, locations, and route history in the memory of the TARGET TELEPHONE;
h. internet browsing history, to include, internet searches in the memory of the TARGET TELEPHONE; and
i. images and videos in the memory of the TARGET TELEPHONE.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

15

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described TARGET TELEPHONE may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

It is further authorized that the officers executing this warrant may send the TARGET TELEPHONE to a commercial vendor outside of Connecticut to permit the analysis called for herein.